UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07 CR 851 |
| | ) | |
| | ) | |
| FRANCISCO MENDEZ-NUNEZ, *et al.* | ) | Judge Robert W. Gettleman |
| | ) | |

### GOVERNMENT'S RESPONSE TO FRANCISCO MENDEZ JR.'S
### MOTION TO SUPPRESS TITLE III MATERIAL

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully submits the following response to

Defendant Francisco Mendez, Jr.'s Motion To Suppress Title III Material.  For the reasons set forth

below, defendant's motion should be denied.

### BACKGROUND

In 2006, a DEA confidential source ("CS-1") provided information to the Drug Enforcement

Administration ("DEA") regarding a drug-trafficking organization overseen by Individual A

(hereinafter, the "DTO").  Two of the individuals identified by CS-1 as members of the DTO are

defendants in this case: (1) Francisco Mendez-Nunez (a/k/a "Pancholine"), who, according to CS-1,

ran the DTO's day-to-day operations in Chicago; and (2) Salvador Garcia (a/k/a "Chava"), who,

according to CS-1, distributed cocaine for the DTO and collected drug proceeds.

Based on CS-1's information, the DEA conducted an extensive investigation of the DTO

using traditional law-enforcement procedures, including: (1) physical surveillance; (2) analysis of

telephone records, pen registers and trap-and-trace data; (3) use of confidential witnesses; (4) trash

pulls; (5) arrests/seizures; and (6) controlled purchases.  *See* TIII_TP2_001-00052-60,

TIII_TP2_001-00354-62, TIII_TP3_001-00155-64 and TIII_TP3_001-00420-30.  For example, in

June 2007, the DEA arrested an individual after he/she purchased cocaine from Garcia ("CS-2").

Following his/her arrest, CS-2 agreed to cooperate in the DEA's investigation.  On June 27, 2007,

CS-2 made a controlled purchase of cocaine from Garcia.  CS-2 made a second controlled purchase

from Garcia on July 11, 2007.

On August 13, 2007, the government submitted an Application for a Title III wiretap on a

cellular phone used by Salvador Garcia (hereinafter, "Target Phone 2").  Chief Judge Holderman

entered an Order authorizing the interception of wire communications to and from Target Phone 2

on August 13, 2007 (the "8-13-07 Order").  On September 11, 2007, Chief Judge Holderman entered

an Order authorizing the continued interception of wire communications to and from Target Phone

2 (the "9-11-07 Order").

The DEA's investigation – aided by the wiretap on Target Phone 2 – developed significant

evidence of Garcia's drug-trafficking activities.  In addition, the DEA established that Mendez-

Nunez was likely involved in the distribution of wholesale amounts of cocaine.  But the methods of

operation of Mendez-Nunez and the DTO limited the value of traditional law-enforcement

procedures like physical surveillance, confidential sources, pen registers and trash pulls, and made

the introduction of an undercover agent unfeasible and potentially dangerous.  *See generally*

TIII_TP3_001-00155-64. Further, the DEA concluded that other overt law-enforcement procedures

– including search warrants, interviews of subjects and grand jury subpoenas – would likely

comprise the investigation and, in any event, would not likely provide evidence of the full scope of

the DTO, including the identities of its members, their roles, the DTO's places for doing business

and the DTO's means and locations for storing and transporting wholesale quantities of cocaine.

*See generally* TIII_TP3_001-00155-64.  In short, the DEA concluded that a wiretap on Mendez-

Nunez's phone – cellular telephone (773) 315-0030 ("Target Phone 3") – was the only available

law-enforcement technique with a reasonable likelihood of identifying the full scope of the DTO, securing evidence necessary to prove beyond a reasonable doubt the guilt of each member of the conspiracy and achieving fully the goals of the investigation, which included dismantling the DTO. TIII_TP3_001-000154. Accordingly, on October 9, 2007, the government applied for a wiretap on Target Phone 3.

On October 9, 2007, Chief Judge James F. Holderman entered an Order authorizing the interception of wire communications to and from Target Phone 3 for a period of thirty days (the "10-9-07 Order"). On November 8, 2007, Chief Judge James F. Holderman entered an Order authorizing the continued interception of wire communications to and from Target Phone 3 for a period of thirty days (the "11-8-07 Order").

Based in large part on evidence obtained as a result of the wiretap on Target Phone 3, on December 19, 2007, the government filed a criminal complaint against the nine defendants in this case alleging a conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846. On March 18, 2008, the grand jury returned a nine-count indictment against defendants, which included a conspiracy count under 21 U.S.C. § 846, seven distribution counts under 21 U.S.C. § 841(a)(1) and a phone count under 21 U.S.C. § 843(b).

On June 30, 2008, Francisco Mendez, Jr., filed the present motion challenging the Chief Judge's 10-9-07 Order authorizing the interception of wire communications on Target Phone 3[1]. All defendants have joined in this motion.

---

[1] As defendant correctly notes (at 7), he does not have standing to suppress Target Phone 2, because he was not intercepted over that phone. Thus, defendant's motion only seeks suppression of the evidence obtained from Target Phone 3.

## ARGUMENT

I.    **The Government Established Necessity for the Target Phone 3 Wiretap.**

In entering the 10-9-07 Order, Chief Judge Holderman concluded that the government's application made a sufficient showing of necessity under 18 U.S.C.A. § 2518(3)(c), which permits a Title III wiretap only upon a showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." In his motion, defendant challenges Chief Judge Holderman's finding in this regard on two primary grounds. First, defendant contends (at 7-11) that the government failed to fully utilize normal investigative procedures. Second, defendant contends (at 11-12) that the Title III wiretap for Target Phone 3 was unnecessary in light of the evidence gathered through normal investigative channels and the Title III wiretap on Target Phone 2. As set forth below, both contentions are meritless. Defendant's motion should be denied.

A.    **Legal Standard**

Under 18 U.S.C. § 2518(1)(c), an affidavit in support of a Title III wiretap must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Thompson*, 944 F.2d 1331, 1339-40 (7th Cir. 1991). This requirement is often referred to as "necessity." Because subsection (c) is written in the disjunctive, the government may establish necessity by demonstrating any one of the three alternatives listed above. *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988).

In discussing this standard, the Seventh Circuit has recognized that:

>This section of the statute was not intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation. The rule in this circuit is that the government's burden of establishing compliance with § 2518(1)(c) is not great, and that the requirement of exhausting other investigative procedures prior to obtaining a wiretap is reviewed in a practical and common-sense fashion. To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means. We have upheld the necessity of wiretap orders on the basis that investigators were having trouble fingering other members of the conspiracy, and that the wiretaps allowed the government to ascertain the extent and structure of the conspiracy.

*United States v. McLee*, 436 F.3d 751, 762 (7th Cir. 2006) (citations and quotation marks omitted).

Further, "the statute does not require that other investigative procedures actually be implemented before an order may be issued for the interception of wire communications, . . . 'but only that the success of other methods of investigation appear unlikely.'" *Zambrana*, 841 F.2d at 1329 (quoting *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976)). In short, the government is not required to "run outlandish risks or exhaust every conceivable alternative" before requesting a Title III wiretap. *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989).

Congress cited the following as normal investigative procedures that should ordinarily be explored:

>[1] standard visual or aural surveillance techniques by law enforcement officers, [2] general questioning or interrogation under an immunity grant, [3] use of regular search warrants, and [4] the infiltration of conspiratorial groups by undercover agents or informants.

*Zambrana*, 841 F.2d at 1329 n.8, quoting U.S. Code & Ad. News 1968, pp. 2112, 2190.

**B.      <u>Standard of Review</u>**

"A finding of necessity is reviewed for abuse of discretion, with great deference given to the determination made by the issuing judge." *McLee*, 436 F.3d at 763. A reviewing court "will reverse the ruling only when no reasonable person could agree with the district court." *United States v. Doyle*, 121 F.3d 1078 (7th Cir. 1997).

C.    **The Chief Judge Did Not Abuse His Discretion In Concluding That The Government's October 13, 2007 Application Established Necessity.**

1.    **October 13, 2007 Application**

In its October 13, 2007 Application, the government's Affiant laid out in detail the DEA's investigation of the DTO, as set forth below.

a.    **Physical Surveillance**

As part of its investigation, the DEA conducted extensive physical surveillance of Garcia (*see*, *e.g.*, TIII_TP2_001-00037-43; TIII_TP2_001-00342 ¶ 17; TIII_TP2_001-00347-50 ¶¶ 29-30, 36, 38), and Mendez-Nunez, (TIII_TP3_001-00137, 141, 143 ¶¶ 15-16, 23, 28). The wiretap on Target Phone 2 was an asset in these efforts. In addition, Chief Judge Holderman authorized installation of a pole camera outside Mendez-Nunez's garage, but as of October 7, 2007, due to issues outside the control of DEA, the camera had not yet been installed and was not expected to be installed for at least 30 days. TIII_TP3_001-00163-64 ¶ 54.

This physical surveillance bore some fruit. But as the government's Affiant noted in its October 13, 2007 Application, "surveillance activities standing alone had been of limited value." TIII_TP3_001-00155. In particular, the government noted several limitations on the use of physical surveillance, anchored in the particular facts on this investigation. First, the government noted that many of the DTO's drug transactions occurred inside local bars – such as Mike's Place, Mi Segunda, Chicago Sports Bar and Grill, XPO Bar, El Ricon Norteno, Inc., El Palenque, Raul's Bar and Grill,

Laura's Bar and Toro Loco – where agents could not enter without arousing suspicion. TIII_TP3_001-00156. Second, the government noted that Mendez-Nunez conducted narcotics transactions in the alley behind his house, where, again, it would be extremely difficult to establish surveillance without risking detection. TIII_TP3_001-00156. Third, for those DTO meetings occurring in places where physical surveillance was feasible, the government noted that wiretap information would direct agents to specific places at specific times. TIII_TP3_001-00157. Fourth, the government noted that physical surveillance would not provide confirmation and proof of the purpose of any observed meeting. TIII_TP3_001-00157. Finally, the government noted that more constant physical surveillance of Mendez-Nunez and his associates would likely result in the detection of law-enforcement or the use of counter-surveillance and evasion techniques, which would adversely affect the investigation. TIII_TP3_001-00156.

### b.     Confidential Sources

As noted above, the DEA developed two confidential sources during its investigation of the DTO: CS-1 and CS-2. CS-1 provided historical information about the DTO and identified Garcia and Mendez-Nunez, among others, as members of the DTO. TIII_TP2_001-00035 ¶¶ 14-15. On one occasion, Mendez-Nunez asked CS-1 to take Garcia on an errand – which turned out to be an apparent drug-money pick up. TIII_TP2_001-00036 ¶ 16. In March 2007, CS-1 met Individual A, who told CS-1 to talk to Mendez-Nunez if he ever wanted a job. TIII_TP2_001-00037 ¶ 17. At the time of the October 13, 2007 Application, CS-1 was in the process of attempting to obtain a commercial driver's license so that he/she could transport narcotics and narcotics proceeds for the DTO. TIII_TP3_001-00158.

CS-2 was arrested after purchasing cocaine from Garcia and subsequently agreed to cooperate in the government's investigation. TIII_TP2_001-00039-43. This cooperation resulted in controlled buys of cocaine from Garcia on June 27, 2007 and July 11, 2007.

CS-1 and CS-2 were invaluable in developing evidence against Garcia. But as the government noted in its Application, CS-1 and CS-2 had limited knowledge of Mendez-Nunez's activities and were not in a position to furnish information that would enable the DEA to fully identify all the members of the DTO, along with their roles. TIII_TP3_001-00157. As defendant points out (at 9) – and as noted above – Individual A did tell CS-1 to talk to Mendez-Nunez about a job with the DTO and, at the time of the October 13, 2007 Application, CS-1 was in the process of obtaining a commercial driver's license so that he could transport narcotics and narcotics proceeds for the DTO.[2] TIII_TP3_001-00158. But at the time of the Application, CS-1 was not yet working for the DTO and, as the government's Affiant noted, "[e]ven if CS-1 should become able in the future to participate in narcotics shipments, CS-1 is nonetheless unlikely to be able to collect evidence sufficient to identify and prosecute all members of the organization, including its leadership hierarchy, due to the compartmentalized nature of drug trafficking organizations and operational limitations on [CS-1's] activities due to safety and other concerns." TIII_TP3_001-00158.

### c.    Review of Telephone Records

As part of this investigation, DEA conducted an extensive review of the telephone records for Target Phone 2 and Target Phone 3. *See*, *e.g.*, TIII_TP2_001-00045-51 (Target Phone 2); TIII_TP3_001-00149-54 (Target Phone 3). But as the government's Affiant noted, "telephone

---

[2] Defendant's contention (at 11) that the government "inexplicably neglected to pursue this lead" is incorrect.

analysis and pen registers cannot indicate the time, place, or manner of delivery of controlled substances or the method of importation and distribution," or "the roles and participation of the persons initiating or receiving the telephone calls."  TIII_TP3_001-00160.

### d.    Trash Pulls

The DEA also conducted several trash pulls as part of its investigation.  *See*, *e.g.*, TIII_TP2_001-00060 ¶ 51 (Garcia); TIII_TP3_001-00162 (Mendez-Nunez).  The government's Affiant noted, however, that while trash pulls can result in evidence confirming the target's "involvement in narcotics trafficking, it is not by itself sufficient to sustain a criminal prosecution, nor can it achieve the investigation's broader objectives."  TIII_TP3_001-00613.

### e.    Undercover Agents

The government's Affiant noted in his affidavit that Mendez-Nunez, like others in the drug trade, tended to rely on longstanding relationships of trust, which made it unlikely that he would be willing to associate with an outsider.  TIII_TP3_001-00158.  Accordingly, the Affiant noted it would be extremely difficult and potentially dangerous for an undercover agent to attempt to infiltrate the DTO, or to approach Mendez-Nunez specifically.  TIII_TP3_001-00159.  The Affiant also noted that even if such an operation could potentially succeed, it would take an unreasonably long period of time in light of the level of trust that would likely be required by Mendez-Nunez and other members of the DTO.  TIII_TP3_001-00159.  And as with the cooperating sources, the Affiant noted that an undercover would likely be exposed to only a very limited part of the DTO, which would not permit the DEA to fully identify the scope and membership of the DTO.  TIII_TP3_001-00159.

### f.    Search Warrants

The government's Affiant noted his belief that search warrants would be premature prior to the time the DEA gained a more complete understanding of the DTO, including its members, their

places for doing business and their means and locations for storing and transporting wholesale quantities of cocaine. TIII_TP3_001-00160. Further, the Affiant stated his belief that executing search warrants at that time would likely compromise the investigation by alerting DTO members to the existence of the investigation. TIII_TP3_001-00160.

### g.    Interviews of Subjects

The government's Affiant noted that interviews of suspected DTO members would produce insufficient information regarding the identity of DTO members and the DTO's methods and operations, and also noted the operational downside – alerting members of the DTO to the existence of the investigation, thereby compromising the investigation and resulting in the possible destruction of evidence. TIII_TP3_001-00161.

### h.    Subpoenas

The government's Affiant noted that grand jury subpoenas for testimony would likely result in DTO members invoking their Fifth Amendment rights. TIII_TP3_001-00162. And any grant of immunity would have been premature, insofar as the DEA had not yet identified the roles of the various members of the DTO. TIII_TP3_001-00162. Further, and most important, the Affiant noted that grand jury subpoenas would alert members of the DTO to the existence of the investigation, thereby compromising the investigation and possibly resulting in the destruction of evidence. TIII_TP3_001-00162.

### 2.    Argument

As detailed above, the DEA employed numerous traditional investigative procedures – including surveillance, use of confidential sources, controlled purchases, pen registers and trash pulls – prior to applying for a wiretap on Target Phone 3. Defendant admits as much in his motion. Mot. at 7 ("At the time the government applied for the first wiretap application, they had used

several 'normal' investigative techniques with great success."). Further, in applying for a wiretap on Target Phone 3, the government noted the limitations on the above-mentioned investigative procedures, along with its reasons for avoiding overt investigative steps like grand jury subpoenas and search warrants. In short, the government represented that although the investigation had established Garcia's role as a retailer of cocaine for the DTO and Mendez-Nunez's involvement in the DTO, the investigation had not yet determined the full scope of the DTO or the roles played by Mendez-Nunez and other members of the conspiracy. TIII_TP3_001-00154. Further, the Affiant stated that, based on his training and experience, a Title III wiretap was the only investigative alternative that had a reasonable likelihood of achieving the investigation's goals:

> Based on my training and experience, as well as the experience of other law enforcement officers involved in this investigation, and also based on all of the facts set forth herein, it is my belief that the interception of wire communications is the only available technique with a reasonable likelihood of identifying the full scope of the above-described conspiracy, securing evidence necessary to prove beyond a reasonable doubt the guilt of each of the offenders involved in the conspiracy, and fully achieving the goals of the investigation, which include the dismantling of the drug-trafficking organization (including components outside Chicago), the identification of all co-conspirators, the identification and prosecution of the ultimate sources of cocaine (including those that may be outside the United States, including Mexico and/or Columbia), the seizure of cocaine, and the forfeiture of drug proceeds and property used in facilitation of the crimes, among other objectives.

TIII_TP3_001-00154.

In light of the above, defendant's contention that Chief Judge Holderman abused his discretion in concluding that the government demonstrated necessity is meritless. First, the government engaged in extensive surveillance and the DTO's methods of operation – including drug transactions in local taverns and meetings in the alley behind Mendez-Nunez's home – made more extensive physical surveillance unrealistic and potentially dangerous. *See*, *e.g.*, *United States v. Dumes*, 313 F.3d 372, 379 (7th Cir. 2002) (upholding finding of necessity noting that "[t]he

Brightwood section of Indianapolis is a 60-square-block area in which the alleged dealers are well-known. Outsiders, such as agents conducting surveillance, would be spotted."); *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991) (upholding finding of necessity where government experienced "difficulty in conducting undercover surveillance in [defendant's] ethnic neighborhood"); *Zambrana*, 841 F.2d at 1330 (upholding finding of necessity where affidavit averred that "[s]urveillance of the subjects and/or any of the premises associated with the subjects must be conducted in a limited fashion in order avoid alerting the subjects to the fact that they are under investigation"). Case law cited by defendant is in accord. *See United States v. DiMuro*, 540 F.2d 503, 511 (1st Cir. 1976) (upholding finding of necessity where affidavit averred that "since 58 Delano Avenue was located in a quiet residential area, any 'fixed physical surveillance' would be 'impractical'" and "that because the building at the address in question was a one-story residential house where the curtains were 'usually closed' it was 'impossible to see inside' from a 'fixed or moving' observation post").

Second, for the various investigate procedures that had been employed – including surveillance, use of confidential sources, controlled purchases, pen registers and trash pulls – the government noted that these measures, standing alone, would not enable it to ascertain all the members of the conspiracy and their various roles. This too supports Chief Judge Holderman's finding of necessity. *See, e.g.*, *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995) ("Even if it were true that the government could have prosecuted [defendant] without the tapes, the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict these five [additional defendants], the key players in the drug ring. It would have been far more difficult or impossible to determine the extent of their involvement, such as [co-defendant] Bonavolante's role as financier, by merely observing transactions from a

distance."); *see also Farmer*, 924 F.2d at 652 (upholding finding of necessity based, in part, on fact that "investigation was having trouble fingering other members of the conspiracy without electronic surveillance"). And contrary to defendant's suggestion (at 7), upon receiving Title III authorization, the government did not "eschew" normal investigative procedures, become "lazy" and rely solely on the "easier investigative technique of wiretapping." To the contrary, the DEA continued its extensive physical surveillance of the DTO – aided greatly by the Title III intercepts – and made attempts to develop additional confidential sources beyond CS-1 and CS-2. *See generally* TIII_TP3_001-00412-16, 21-23 (physical surveillance); TIII_TP3_001-00423-24 ¶ 39 (detailing efforts to use Individual C as cooperating source). These efforts resulted in the seizure of two kilograms of cocaine on October 31, 2007. TIII_TP3_001-00415-16 ¶¶ 28-29.

Third, for those investigative procedures that had not been attempted – including search warrants, grand jury subpoenas and undercover agents – the government satisfactorily explained why those measures reasonably appeared unlikely to succeed if tried or too dangerous to attempt. For example, in discussing the feasibility of introducing an undercover agent into the DTO, the Affiant stated that:

> Mendez-Nunez and his associates . . . tend to rely on trust and longstanding relationships among their associates. Drug dealers, as well as their associates, are, by the very nature of their criminal activity, highly suspicious and unwilling to associate with outsiders. Consequently, it would be extremely difficult and potentially dangerous for an undercover agent/officer to initiate an undercover into Mendez-Nunez's narcotics distribution business.

TIII_TP3_001-00159. Here again, case law firmly supports Chief Judge Holderman's finding of necessity based, in part, on these operational limitations. *See*, *e.g.*, *Farmer*, 924 F.2d at 652 (upholding finding of necessity based, in part, on "possible danger to undercover agents and cooperating witnesses"); *Dumes*, 313 F.3d at 379 (upholding finding of necessity noting that

"affidavit also stated the obvious – that the use of interviews or grand jury subpoenas of alleged conspirators or their associates would tip them off"); *see also United States v. Mancari*, 663 F.Supp. 1343, 1348 (N.D. Ill. 1987) (upholding finding of necessity, citing, among other things, fact that "calling any of the conspirators to testify before the grand jury could reveal the objective of the investigation to the criminal enterprise, allowing it to more effectively cover its tracks").

Rather than attack these justifications head on, defendant (at 7) asks this Court to dismiss them as "boilerplate generalizations and statements lacking any details related to this case or the present investigation." But as set forth above, the Affiant set forth numerous specific facts relating to the DTO's methods and operation and other investigative limitations. For example, the Affiant stated that agents could not enter the taverns where drug transactions were believed to occur without arousing suspicion. TIII_TP3_001-00156. Further, the Affiant stated that "Mendez-Nunez conducts narcotics transactions in the alley behind his residence, an area that is difficult to view." TIII_TP3_001-000156. And although the DEA was eventually able to install and activate a pole camera in the alley behind Mendez-Nunez's garage,[3] the camera "provide[d] no view inside the garage of Mendez-Nunez." TIII_TP3_001-00431.

While it is true that, in some parts of the Application, the Affiant relied on his training and experience – along with the training and experience of other law-enforcement officers – together with characteristics of drug organizations and drug crimes, defendant's suggestion (at 7) that these statements are "conclusory and un-substantiated assertions" is unavailing. As recognized in *United States v. Ashley*, 876 F.2d 1069, 1072-73 (1st Cir. 1989) – cited by defendant (at 6) – "the issuing court may properly take into account affirmations which are founded in part upon the experience of

---

[3] This occurred on October 26, 2007, after Chief Judge Holderman entered the 10-9-07 Order.

14

specially trained agents" together with "the nature of the alleged crimes in its evaluation of the sufficiency of the affidavit as to the required showing of antecedent efforts."  Further, what defendant seeks to dismiss as "boilerplate" are, instead, common problems associated with investigations of large-scale drug-trafficking organizations.  That does not make the problems any less real.  "What counts is whether the agent's assertions are supported by the facts in the Affidavit and the nature of the investigation being conducted."  *United States v. Dorfman*, 542 F.Supp. 345, 399 (N.D.Ill. 1982).

Similarly, defendant's "post-factum suggestions as to how [the] investigation might have been handled [without wiretapping] are entitled to little weight in an analysis of statutory compliance with [18 U.S.C.] 2518(1)(c)."  *United States v. Mancari*, 663 F.Supp. 1343, 1350 (N.D. Ill. 1987).  For example, defendant suggests (at 8) that "[t]he way to learn what was actually said at [a drug] meeting would be to establish audio surveillance at the actual meeting, or perhaps utilize the informers during the meetings."  As an initial matter, defendant fails to explain how the government could establish audio surveillance at the two most common places the DTO was known to meet – local taverns and the alley behind Mendez-Nunez's garage.  Moreover, as recognized in the cases defendant relies upon (at 6), "[t]here is no requirement that every investigative methodology be exhausted prior to application for a section 2518 authorization.  Investigators are not obliged to try all theoretically possible approaches.  It is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation."  *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976).

Defendant also suggests (at 10) that the Affiant's averments concerning limitations on physical surveillance are "wholly unbelievable and without merit" since "there is no indication that

law enforcement was ever detected." This contention is (at best) puzzling. For one thing, the government need not demonstrate that "other investigative procedures have been tried and failed"; instead, section 2518 also permits the government to show that procedures "reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Thompson*, 944 F.2d at 1339-40. But more to the point, defendant essentially asks this Court to construe section 2518's necessity requirement to require that the government compromise its investigation and/or place its agents in harm's way before applying for a Title III wiretap. That is not the law.

Finally, defendant contends (at 11-12) that the October 11, 2007 Application for a wiretap on Target Phone 3 was unnecessary because the government "had already garnered more than sufficient evidence from the previous wiretap of Target Phone 2 and use of CS-1 and CS-2." This argument is meritless. Defendant was not intercepted over Target Phone 2. Thus, Target Phone 3 provided key evidence – defendant's own words – to support a charge against him for conspiring to distribute a controlled substance.

Moreover, there is a difference between probable cause sufficient to support a Title III application and proof beyond a reasonable doubt. Unsurprisingly, both the Supreme Court and the Seventh Circuit have rejected this type of argument. *See United States v. Lovasco,* 431 U.S. 783, 792-93 (1977) ("[C]ompelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice."); *Plescia*, 48 F.3d at 1463 (rejecting argument that wiretap unnecessary "because investigators had enough evidence without it and/or could have obtained sufficient evidence through ordinary investigative

techniques"). As in *Plescia*, "[e]ven if it were true that the government could have prosecuted [defendant] without the tapes, the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict [additional defendants], the key players in the drug ring. It would have been far more difficult or impossible to determine the extent of their involvement . . . by merely observing transactions from a distance." *Id.*

## II.    The Government Properly Minimized the Target Phone 3 Wiretap.

In his motion, the defendant has also made a broad attack on the government's efforts to "minimize," or limit, the interception of conversations that did not relate to the government's investigation. The defendant's argument in this regard must fail.

18 U.S.C. § 2518(5) states that any order authorizing the interception of wire communications pursuant to the statute "shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." "What the minimization requirement means, essentially, is that once the monitoring agent has had a reasonable opportunity to assess the nature of an intercepted communication, he or she must stop monitoring that communication if it does not appear relevant to the government's investigation." *United States v. Mares-Martinez*, 240 F. Supp. 2d 803, 816 (N.D. Ill. 2003) (Kennelly, J.) (citing *United States v. Mansoori*, 304 F.3d 635, 646 (7th Cir. 2002)).

Where a trial court is asked to assess the sufficiency of the government's efforts to minimize during the course of a wiretap investigation, it "must determine whether the steps the agents took to minimize the interception of communications unrelated to the investigation were objectively reasonable given the circumstances they confronted." *Id.* (citing *Scott v. United States*, 436 U.S. 128, 137, 98 S. Ct. 1717 (1978)). "Although the adequacy of the government's minimization efforts

necessarily depends on the facts of each case, relevant considerations include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that non-pertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and the extent to which the authorizing judge oversaw the interception efforts." *Mansoori*, 304 F.3d at 647; *see also United States v. Quintana*, 508 F.2d 867, 874-75 (7th Cir. 1975). Further, "where an investigation involves a drug ring of unknown proportion . . ., 'the need to allow latitude to eavesdroppers is close to its zenith.'" *Id.* (citing *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000)).

In this case, as an initial matter, the Applications for Interception of Wire Communications submitted by the government to Chief Judge Holderman and the Orders signed by the Court all complied with the statutory minimization requirement. Specifically, the government's Applications requested that the Court's Order state that "all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and as further indicated in the attached Affidavit. The interception of wire communications authorized by this Court's order must terminate upon attainment of the authorized objectives, or in any event, at the end of thirty days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception or ten days after the Order sought in this Application is entered." TIII_TP3_001-00110; TIII_TP3_001-00384.

To further ensure that the Court's order regarding the statutory minimization requirement was complied with, the government prepared and presented to the agents working the wire a

document entitled "Instructions for Interception of Communications" (hereinafter the "Minimization Instructions"). TIII_TP3_001-00362; TIII_TP3_001-00550. In paragraph 4 of the Minimization Instructions, the monitoring agents were warned, "If you listen to every conversation, the fruits of your investigation may be suppressed unless all the conversations and conduct were pertinent and were not privileged. We have to establish that we neither listened to nor observed nor recorded conversations we had no right to overhear or observe. No machine is to be left unattended on automatic. 'Minimization' requires that the agents and officers make a good faith determination of whether or not each conversation is relevant to those illegal activities described in Paragraph Six below." TIII_TP3_001-00363; TIII_TP3_001-00551. Paragraph 7 of the Minimization Instructions further stated that, "Individuals intercepting the conversations may spot monitor (as further described below) for a reasonable period of time not to exceed two minutes to determine whether one of the subjects are present and participating in a conversation. This spot monitoring may occur as often as reasonable, but in any event at least one minute should elapse between interceptions. If you determine that the conversation is not a criminal conversation, turn the machine off (both the listening and recording devices)."[4] TIII_TP3_001-00366; TIII_TP3_001-00554. This is all to say that the government and its agents took the minimization requirement very seriously and the government made sure that all law enforcement personnel monitoring the wiretaps were aware of

---

[4] Though the defendant has not directly challenged the methods by which law enforcement spot monitored Target Phone 3, the Seventh Circuit has found that two to three minutes is a reasonable time within which to make an initial judgment as to the pertinence of a conversation. *See Mansoori*, 304 F.3d at 647; *see also United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992); *United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989); *United States v. Losing*, 560 F.2d 906, 909 n. 1 (8th Cir. 1977); *United States v. Armocida*, 515 F.2d 29, 45 (3d Cir. 1975); *Bynum v. United States*, 423 U.S. 952, 954 (1975) (Brennan, J., dissenting from denial of certiorari) (noting that brief calls--apparently those of less than three minutes in duration--will generally not be subject to minimization).

the rules to be followed (including the spot monitoring standards) and the potential consequences for failing to follow those rules.

Nevertheless, the defendant argues in his motion that the government failed to comply with the minimization requirement. The defendant has tried to make this point by resorting to a distorted interpretation of the information provided to the Court in the periodic "ten-day reports" filed at the conclusion of days 1-10 and 11-20 of the thirty-day interception periods. Defendant's arguments are meritless.

First, defendant states (at 14) that the government "inexplicably" failed to file progress reports for days 21-30 of the interception period. In fact, there is a perfectly reasonable explanation for why such reports were not filed – they were not required by the Chief Judge. The orders authorizing the original and the extension wiretap on Target Phone 3 *only* require reports at the conclusion of day 10 and day 20 of the interception period.

Second, defendant claims (at 14) that the ten-day reports generally point to the government's failure to minimize. What the defendant has failed to inform the Court in his motion is that the vast majority of calls intercepted over Target Phone 3, both pertinent and non-pertinent, were less than two minutes in length.

The October 19, 2007 report for days 1-20 indicated that 10 calls were intercepted, of which 8 were pertinent, and of which 1 had been minimized. TII_TP3_001-00192-93. Of the 9 non-minimized calls, 5 were greater than two minutes in duration. TII_TP3_001-00193. The October 30, 2007 report for days 11-20 indicated that 44 calls were intercepted, of which 22 were pertinent, and none of which were minimized. TII_TP3_001-00278-79. Of the 44 non-minimized calls, only 9 were greater than two minutes in duration. TII_TP3_001-00279.

20

The November 20, 2007 report for days 1-20 (of the second thirty-day interception period for Target Phone 3) indicated that 102 calls were intercepted, of which 21 were pertinent, and of which 2 were minimized. TII_TP3_001-00456-57. Of the 100 non-minimized calls, only 11 were greater than two minutes in duration. TII_TP3_001-00457. The November 28, 2007 report for days 11-20 indicated that 65 calls were intercepted, of which 10 were pertinent, and of which 3 were minimized. TII_TP3_001-00506-07. Of the 62 non-minimized calls, only 9 were greater than two minutes in duration. TII_TP3_001-00506.

Defendant is correct that 221 total calls were intercepted over Target Phone 3, and that a total of 6 were minimized. However, only 34 calls were greater than two minutes. This two minute time period is significant because, as was discussed above in footnote 4, courts, including the Seventh Circuit, have found that two to three minutes is a reasonable time within which to make an initial judgment as to the pertinence of a conversation. *See Monsoori*, 304 F.3d at 647. In other words, if the intercepted call lasts less than two minutes, law enforcement monitoring the wiretap need not "minimize" the call because an agent's ability to "make quick assessments of the pertinence of a conversation [is] difficult." *Id.* at 645-46.

What made this two minute period reasonable in this case was the fact that this investigation involved a significant drug trafficking organization with a number of participants (nine were charged in the indictment in this case). Further, the individuals intercepted over Target Phone 3 were speaking in "coded language." *See Mares-Martinez*, 240 F. Supp. 2d at 816 (use of coded language was a factor that "tilt[ed] in favor of giving the investigating agents a reasonable degree of latitude"). For example, on October 10, 2007, at approximately 12:39 p.m. (Call 1003), co-defendant Francisco Mendez-Nunez received a call from co-defendant Don McNish. TIII_TP3_001-00193. Co-defendant Mendez-Nunez stated, "One or two tacos [referring to a quantity of drugs] for

21

you." TIII_TP3_001-00194. Co-defendant McNish responded, "Yeah, one or two taco [referring to a quantity of drugs], be good." On October 27, 2007, at approximately 4:45 p.m. (Call 1073), co-defendant Mendez-Nunez placed a call to UM-5907. TIII_TP3_001-00283. Co-defendant Mendez-Nunez asked, "Did you need a ticket . . . some tickets . . . tickets for the dance or what [asking UM5907 if he wanted narcotics]?" UM5907 responded, "Yes, I need two [referring to an amount of cocaine]."

These are just two examples taken from one particular thirty-day interception period. Over the entire investigation, a multitude of pertinent calls were intercepted in which the participants used coded language. As a result, the government was reasonably entitled to monitor these calls for an initial two minute period (and thereafter to follow the spot monitoring protocol outlined in the Minimization Instructions) to determine if the calls were in fact pertinent and to ensure that the named Interceptees were discussing conduct consistent with the subject offenses. As the Seventh Circuit explained in *Mansoori*, "It is all well and good to say, after the fact, that certain conversations were irrelevant and [monitoring] should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take." *Mansoori*, 304 F.3d at 647 (citation omitted).

Moreover, the government in the course of its electronic surveillance submitted periodic reports to the Chief Judge, "a circumstance that suggests it conducted the surveillance in good faith." *Id.*; *see also Mares-Martinez*, 240 F. Supp. 2d at 816. Further, despite the defendant's argument to the contrary (at 14) if the defendant were to prevail on his challenge, the appropriate relief likely would be to suppress any conversation or conversations that were inappropriately monitored. *Mansoori*, 304 F.3d at 648 (citing 18 U.S.C. § 2518(10)(a)(iii); *Charles*, 213 F.3d at 22 (partial suppression of those conversations intercepted improperly is the usual remedy for inadequate

22

minimization efforts; wholesale suppression of all intercepted conversations is reserved for the "particularly horrendous case")).

Perhaps the biggest problem with the defendant's motion is that **he has not identified a single call involving him that he believes should have been minimized but was not**. As the Seventh Circuit in *Mansoori* made clear, "[t]he adequacy of the government's minimization efforts typically cannot be determined in a generalized fashion." 304 F.3d at 648 (citation omitted).

Accordingly, defendant's challenge to the government's minimization efforts in this case should be rejected. Suppression is not warranted on this basis.

## **CONCLUSION**

Based on the foregoing, defendant's motion should be denied.

Respectfully submitted.

PATRICK J. FITZGERALD
United States Attorney


By:    s/Meghan C. Morrissey
       MEGHAN C. MORRISSEY
       J. GREGORY DEIS
       Assistant United States Attorney
       219 South Dearborn Street, 5th Floor
       Chicago, IL  60604
       (312) 886-7625

Dated: August 29, 2008

24

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07 CR 851 |
| | ) | |
| | ) | |
| FRANCISCO MENDEZ-NUNEZ, *et al.* | ) | Judge Robert W. Gettleman |
| | ) | |

### CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following

documents:

**GOVERNMENT'S RESPONSE TO FRANCISCO MENDEZ JR.'S
MOTION TO SUPPRESS TITLE III MATERIAL**

was served on **August 29, 2008**, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5,

and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to

ECF filers.

Respectfully submitted.

PATRICK J. FITZGERALD
United States Attorney

By:     /s/ J. Gregory Deis
J. GREGORY DEIS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 886-7625